Tafford Lee HOLMAN, Petitioner–Appellee/Cross–Appellant,

v.

Jerry D. GILMORE, Warden, Respondent–Appellant/Cross–Appellee.

Nos. 97–1472, 97–1693.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 13, 1997.

Decided Sept. 11, 1997.

---

Stephen E. Eberhardt, Chicago, IL, Robert H. Farley, Jr., Naperville, IL, for Tafford L. Holman.

Steven R. Splitt (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Jerry D. Gilmore in No. 97–1472.

Rita M. Novak, Office of the Attorney General, Steven R. Splitt (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Jerry D. Gilmore in No. 97–1693.

Before COFFEY, EASTERBROOK, and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Tafford Holman is under sentence of death for murder, aggravated by home invasion, kidnapping, sexual assault, robbery, attempted murder, and obstruction of justice by placing a contract on the life of a witness. Holman broke into a home in Joliet, Illinois, shot Anthony Townsend in the head, stole the Townsend family car, and drove off with Antoinette Townsend, Anthony's mother, as his captive. Antoinette begged Holman to get help for her son; he refused and made light of her distress. After reaching Gary, Indiana, Holman pulled the car off the road, ordered Antoinette into the back seat, and sexually molested her. She ran away when a bright light distracted Holman, but he fired four shots at her (two hit their mark) and left her to die. Against the odds, Antoinette survived. After his arrest, Holman offered a friend $2,000 to kill Antoinette so that she could not testify against him. That plan miscarried and became one of the aggravating circumstances that supports the death penalty. Holman concedes entering the Townsend home in the dead of night (although he says that he just wanted to confront Anthony about a supposed slight to Holman's father and that a "Zeich" or "Zeke" was the triggerman), not calling for help, stealing the car, kidnapping Antoinette (he denies molesting her), and shooting at her repeatedly (he says that he did not want to kill her). He concedes offering money and a "piece" for aid in preventing Antoinette from testifying but says that he did not want her slain. The jury was entitled to resolve these disputes in favor of the prosecution, and Holman would have remained a candidate for the death penalty even had the jury resolved all of these disputes in his favor. See *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

I

Anthony Townsend died in February 1980. A jury convicted Holman of murder and sentenced him to death, finding several aggravating circumstances and no mitigating circumstances. In June 1984 the Supreme Court of Illinois affirmed the finding of guilt but remanded for a new sentencing after concluding that the prosecutor made an improper closing argument at the penalty trial. *People v. Holman*, 103 Ill.2d 133, 82 Ill.Dec. 585, 469 N.E.2d 119 (1984). Holman filed a petition for a writ of certiorari, seeking review of an argument concerning the evidence admitted at the trial. The Supreme Court denied this petition on February 19, 1985. 469 U.S. 1220, 105 S.Ct. 1204, 84 L.Ed.2d 347 (1985). Two months later, the Court granted a petition by James K. Batson, who argued that the prosecutor's use of peremptory challenges to remove black members of his venire violated the equal protection clause of the fourteenth amendment. 471 U.S. 1052, 105 S.Ct. 2044, 85 L.Ed.2d 342 (1985). Holman likewise had objected at trial to the prosecutor's use of peremptory challenges to remove black members of the venire, and he renewed this argument in the Supreme Court of Illinois, but he omitted it from the petition for certiorari.

A second jury sentenced Holman to death. After *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was released, the Supreme Court of Illinois ordered the trial court to hold a hearing concerning the peremptory challenges the prosecutor exercised against the venire that produced this sentencing jury. Eventually that claim was rejected on the merits and the death sentence affirmed. *People v. Holman*, 132 Ill.2d 128, 138 Ill.Dec. 155, 547 N.E.2d 124 (1989). But the court declined to examine the use of peremptory challenges at the original trial, ruling that *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), foreclosed Holman's request. *Allen* holds that *Batson* does not apply to cases that became "final" before *Batson* was decided. The state court concluded that the denial in 1985 of Holman's petition for certiorari seeking review of his conviction marked the date of "finality" for all issues concerning that trial. 138 Ill.Dec.

at 158–59, 547 N.E.2d at 127–28. The court did, however, consider at length and reject Holman's argument that he had received ineffective assistance of counsel from Paul Bjekich, who represented him at the second sentencing hearing. 138 Ill.Dec. at 166–71, 547 N.E.2d at 135–40.

Next Holman filed a collateral attack in state court. His principal argument was a renewed attack on Bjekich's performance. The trial judge held a hearing and allowed Holman's latest lawyer to explore at length the reasons for Bjekich's strategic and tactical decisions. Satisfied that Bjekich's performance met the constitutional standard, see *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court denied the petition. This decision, too, was affirmed, and the Supreme Court of Illinois discussed the ineffective-assistance arguments at even greater length than before. *People v. Holman*, 164 Ill.2d 356, 207 Ill.Dec. 467, 470–77, 647 N.E.2d 960, 963–70 (1995). A further *Batson* argument was rebuffed on the ground that the decision under attack became "final" before the date the new principle was established. Many other contentions were mulled over and found wanting.

Presently Holman asked the district court to appoint a lawyer under 21 U.S.C. § 848(q)(4)(B), as interpreted in *McFarland v. Scott*, 512 U.S. 849, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994). The court obliged. Ten months later, on August 1, 1996, Holman filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, raising 35 distinct claims, many with sub-parts (according to the petition, counsel at sentencing was ineffective in 41 ways). The district judge rejected 33 of the claims but issued a writ of habeas corpus on the remaining two: the judge held that *Batson* applies and that Bjekich rendered ineffective assistance. The judge also issued a certificate of appealability limited to 7 of the 33 rejected claims. We denied a motion to "expand" this certificate to cover all 33 claims. Whether the certificate of appealability limits the issues that may be considered on appeal is a question for another day. We shall have nothing to say on that score, because when declining to expand the certificate we considered the additional is-

sues Holman sought to present and found none to be even arguably meritorious.

**II**

■ Before considering the merits of Holman's arguments, we must decide whether the amendments to § 2254 in the Antiterrorism and Effective Death Penalty Act govern. *Lindh v. Murphy*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), holds that the new rules apply only to collateral attacks filed after the AEDPA's enactment. Holman's case straddles that line: the request for counsel was filed before April 24, 1996, and the petition for habeas corpus was filed afterward. Holman insists that the motion for appointment of counsel initiates the collateral attack, while the state contends that the formal § 2254 petition is what matters. Both sides find comfort in some language from *Lindh* and other language from *McFarland*, but neither opinion was written with this problem in mind, and it is inappropriate to flog the language of either opinion until it confesses to the desired outcome.

*Lindh* rests on a difference between Chapters 153 and 154 of the Judicial Code. The AEDPA provides that Chapter 154 applies to "cases pending on or after the date of enactment" (110 Stat. 1226) while Chapter 153, which contains § 2254, lacks any provision one way or the other about application to pending cases. The Court took that difference to mean that the changes to Chapter 153 do not apply to pending cases. But what is a "case" for this purpose? Nothing in the AEDPA defines the set of "cases" to which the effective-date rules apply, but the most logical definition is the universe of cases otherwise covered by Chapter 153 (28 U.S.C. §§ 2241–55) or Chapter 154 (28 U.S.C. §§ 2261–66)—which is to say, a collateral attack on a criminal judgment. Prisoners file many other kinds of suits, such as civil rights actions under 42 U.S.C. § 1983, but it would not be a sensible reading of the effective-date clause in Chapter 154 to say that every species of prisoner litigation is a "case pending" for its purpose. A motion under § 848(q)(4) for appointment of counsel is a prelude to a collateral attack under Chapter 153 or 154 but is not itself a collateral attack.

Section 848 is not even in the same title of the United States Code as § 2254. *McFarland* stresses the difference between the function of § 848(q)(4) and that of § 2254 when observing that counsel may be needed to prepare a petition that will survive summary dismissal; this is why Congress "established a right to preapplication legal assistance for capital defendants" (512 U.S. at 855, 114 S.Ct. at 2572).

Although it is linguistically possible for this "preapplication legal assistance" to open a "case" having some affinity to a petition under § 2254—the Court held in *McFarland* that a district court that has appointed counsel possesses discretion to enter a stay of execution under 28 U.S.C. § 2251, see 512 U.S. at 857–59, 114 S.Ct. at 2573–74—the motion for counsel is not itself a petition, because it does not call for (or even permit) a decision on the merits. And it is "the merits" that the amended § 2254(d)(1) is all about. This implies that the sort of case opened by a motion under § 848(q)(4) is not the kind of pending litigation mentioned in Chapter 154's effectiveness clause, and therefore is outside the rationale of *Lindh*. A § 2254 case is commenced on the date the petition is filed. That is what Rule 3 of the Rules Governing Section 2255 Proceedings for the United States District Courts establishes. Cf. Fed.R.Civ.P. 3, in conjunction with § 2255 Rule 12. Neither § 848 nor *McFarland* suggests any alteration of the usual rule that a case is commenced by filing a petition seeking substantive relief. On the date the AEDPA was enacted, the district court was unable either to grant or to deny collateral relief, because Holman had not filed a petition. Holman filed his petition after April 24, 1996, so the AEDPA applies.

## III

◼] Nothing in the AEDPA affects the *Batson* question. Our opinion in *Lindh* stressed that § 2254(d)(1) does not give state courts any leeway on issues of federal law. 96 F.3d 856, 870–71 (7th Cir.1996) (en banc). The grant of certiorari in *Lindh* excluded this issue (and most of the other elements of the opinion), so our treatment remains authoritative in this circuit. Federal law defines what makes a decision final for purposes of retroactivity analysis. A decision is "final" when the defendant has exhausted state appellate remedies and either the Supreme Court of the United States has denied a petition for certiorari or the time for filing a petition has expired. *Allen*, 478 U.S. at 258 n. 1, 106 S.Ct. at 2880 n. 1. See also *Teague v. Lane*, 489 U.S. 288, 295, 109 S.Ct. 1060, 1067, 103 L.Ed.2d 334 (1989); *Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987). The time for filing a petition does not even begin until the "highest court of a State in which a decision could be had" has rendered a "final" decision. 28 U.S.C. § 1257(a). A certiorari petition seeking review of a non-final decision does not make the decision final, so the fact that Holman actually filed a petition for certiorari in 1984 is irrelevant. The only important question is whether the 1984 decision of the Supreme Court of Illinois on the proto-*Batson* issue was "final" for purposes of § 1257. See *Richardson v. Gramley*, 998 F.2d 463 (7th Cir.1993).

*Brady v. Maryland*, 373 U.S. 83, 85 n. 1, 83 S.Ct. 1194, 1195 n. 1, 10 L.Ed.2d 215 (1963), shows that the 1984 decision was reviewable under § 1257(a). In *Brady* the state's highest court denied a petition for collateral relief from a conviction but remanded for resentencing; the Supreme Court granted a petition for certiorari and reviewed a question of law that was relevant only to the validity of the conviction. It observed that the decision was final with respect to this issue, because the federal question would survive the proceedings to set the sentence. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 480, 95 S.Ct. 1029, 1038–39, 43 L.Ed.2d 328 (1975), generalizes this approach so that it logically includes decisions on direct appeal in addition to collateral attacks. See Robert L. Stern, Eugene Gressman & Stephen M. Shapiro, *Supreme Court Practice* 130–38 (6th ed.1986). Whether the jury that convicted Holman was selected in accord with constitutional requirements is a subject that was certain to survive the new sentencing hearing; it could not be affected by the choice between capital punishment and life imprisonment, the only subject open on remand; and his proto-*Batson* claim

therefore was reviewable by certiorari in 1984. We held in *Richardson* that a defendant who could have reached the Supreme Court with a contest to the use of peremptory challenges before April 30, 1986, was not entitled to the application, on collateral attack, of *Batson*'s holding. That is equally true of Holman. Had he raised the jury selection question instead of, or in addition to, the evidentiary question, courts might today refer to the *Holman* doctrine rather than the *Batson* doctrine.

■ The district court distinguished *Richardson* on the ground that Richardson's sentence was affirmed and remanded, making later proceedings resemble a post-judgment collateral attack, while Holman's sentence was vacated. *Richardson* remarked this feature of the case, see 998 F.2d at 465, but only as one of two independent reasons why the decision was "final" at the time of the remand. The other reason *Richardson* gave, 998 F.2d at 465–66, is that the definition of "finality" for purposes of § 1257 differs from the definition that word has under 28 U.S.C. § 1291. A criminal defendant may not take an appeal until the sentence has been fixed. See *Berman v. United States*, 302 U.S. 211, 58 S.Ct. 164, 82 L.Ed. 204 (1937). Similarly *Burris v. Parke*, 95 F.3d 465 (7th Cir.1996) (en banc), holds that a prisoner always is entitled to delay filing a collateral attack under § 2254 until after the sentence has become final without fear that delay will be held against him; successive collateral challenges to the conviction and sentence therefore come within the rules adopted by the AEDPA to curtail multiple collateral attacks in a single case. Under § 1257, by contrast, an *issue* of federal law may be reviewed as "final" even though the *decision* or *judgment* is not "final" as the state system understands that term (or as § 1291 uses it for review by the intermediate federal courts). *Richardson*'s decision was reviewable under § 1257 despite the remand; so was Holman's.

The difference between "finality" under § 1291 and "finality" under § 1257 sets a potential trap for criminal defendants, because there is little doubt that a decision may be "final" for purposes of § 1257 on multiple occasions. Holman did not have to seek certiorari in 1984; he could have waited until 1989 and presented all federal issues affecting both the adjudication of guilt and the sentence. See *Reece v. Georgia*, 350 U.S. 85, 87, 76 S.Ct. 167, 169, 100 L.Ed. 77 (1955); *Urie v. Thompson*, 337 U.S. 163, 172–73, 69 S.Ct. 1018, 1026, 93 L.Ed. 1282 (1949); cf. *United States v. Clark*, 445 U.S. 23, 25–26 n. 2, 100 S.Ct. 895, 898–99 n. 2, 63 L.Ed.2d 171 (1980). Grants of certiorari are so difficult to procure that a careful advocate usually waits until the judgment is final in the most rigorous sense, eliminating one potential obstacle to review—the Supreme Court's wariness of reviewing the same case twice. Because the same issue may be "final" and reviewable by certiorari on multiple occasions, a lawyer may believe that timing is irrelevant to retroactivity analysis. That sets a trap, for *Richardson* concludes that only the first "final" decision counts for purposes of *Teague* and related cases. See 998 F.2d at 467–68. Richardson did not petition for certiorari at the earliest possible occasion and may have been a victim of this potential misunderstanding. Holman's is an easier case, because he did not defer seeking review. His lawyer in 1984 believed that the decision was "final" for purposes of § 1257 and filed a petition for certiorari. That assessment of "finality" was correct and is dispositive against Holman. His proto-*Batson* claim was finally resolved before *Batson* was released, and the Supreme Court of Illinois therefore was right to hold that *Batson* does not affect the validity of Holman's conviction.

## IV

■ The Supreme Court of Illinois twice gave extended attention to Holman's claim that Bjekich rendered ineffective assistance of counsel, applying *Strickland*'s legal standard. When a state court applies established law, its decision must be respected unless "unreasonable." 28 U.S.C. § 2254(d)(1). *Strickland* builds in an element of deference to counsel's choices in conducting the litigation; § 2254(d)(1) adds a layer of respect for a state court's application of the legal standard. As we put it in *Lindh*, "when the constitutional question is a matter of degree, rather than of concrete entitlements, a 'rea-

sonable' decision by the state court must be honored." 96 F.3d at 871. *Strickland* calls for inquiry into degrees; it is a balancing rather than a bright-line approach, just like the question about confrontation rights we addressed in *Lindh*. This means that only a clear error in applying *Strickland*'s standard would support a writ of habeas corpus. See, e.g., *Porter v. Gramley*, 112 F.3d 1308, 1312–14 (7th Cir.1997); *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir.1997); *Pitsonbarger v. Gramley*, 103 F.3d 1293, 1297 (7th Cir.1996); *Neal v. Gramley*, 99 F.3d 841, 843 (7th Cir.1996).

 None of this is reflected in the district court's opinion, which reads as though the judge were making a *de novo* decision about the way Bjekich should have handled the defense. The district judge did not address the question posed by *Strickland*— whether, taking all of the proceedings into account, counsel made "the adversarial testing process work in the particular case." 466 U.S. at 690, 104 S.Ct. at 2066. Counsel must contest the prosecution's case and advance a good defense; if that role has been fulfilled, a writ of habeas corpus should not issue. See *Burris v. Parke*, 116 F.3d 256 (7th Cir.1997). Yet the district court never asked whether Bjekich put the state's case to the test and protected Holman's fundamental rights; instead the court asked whether a better defense would have been available, and whether Bjekich made errors along the way.

Did the Supreme Court of Illinois deal reasonably with Holman's claims? It addressed with care all of Holman's points, using the *Strickland* framework. Reasonable judges could find its analysis persuasive. Bjekich fought the state's presentation every step of the way. He put on a defense in mitigation, producing witnesses who testified that Holman has been a model prisoner, has attained a GED, and poses no risk if incarcerated. Bjekich sought to persuade the jury that Holman has a problem with drugs and alcohol, and that society will be safe and retribution achieved if he is incarcerated and sober. We recognized in *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir.1996), that how much background investigation to conduct before a capital sentencing is a question of

degree—for time is scarce, many leads do not pan out, and counsel must concentrate attention on the most promising avenues of defense. When there are no fixed guideposts, it becomes all but impossible to characterize the state court's decision as an unreasonable application of clearly established law.

One problem for Bjekich was Holman himself, who insisted on testifying. Holman conceded that he went looking for Anthony after midnight but blamed "Zeke" for shooting Anthony. He added that he did not intend to kill Antoinette, despite firing four bullets at her and sending a friend a note offering $2,000 for her disappearance. ("I have a sister that can get the piece.... I can only come up with 2,000 cash. 1,000 before and one after.... Man, I am going to get that chair if someone don't move out on my behalf.") Holman's unwillingness to accept the first jury's decision could not have gone over well with the second jury. The Supreme Court of Illinois reported that Holman gave similar testimony at the first sentencing "against the advice of his attorney". 82 Ill. Dec. at 591, 469 N.E.2d at 125. Although the record is silent about Bjekich's advice on this subject, Holman does not say that Bjekich encouraged him to repeat this imprudent performance. Holman's testimony not only showed the jury that he had not accepted responsibility for his acts but also opened him to devastating cross-examination. "Zeke" remains a spectral figure; Holman described the events afterward to his friends and relations without reference to any other person, making it easy for the prosecutor to imply that "Zeke" is a figment of Holman's imagination; and by testifying Holman enabled the prosecutor to place before the jury his extensive criminal record. Bjekich tried to palliate the effect of Holman's testimony by offering evidence from jailers and relatives, but, given the nature of Holman's crimes and his lack of contrition, the defense was a lost cause.

The district judge believed that Bjekich could have done better by investigating Holman's mental background. Files assembled before Bjekich took over did not suggest that Holman suffers from any serious mental

problem. From information gathered during the course of the collateral attack in state court, we know what Bjekich could have shown had he commissioned further investigation: that Holman has a low-normal intelligence (IQ 84) and that a head injury suffered in an auto accident when he was 12 slightly impairs his memory. These tests also reveal that he does *not* have any cognitive or behavioral impairments; the brain damage from the accident did not contribute to his criminal behavior. The district judge believed that Bjekich should have discovered these things and placed them before the jury, which might have found Holman more sympathetic as a result.

Let us suppose that this would have been a better defense—although here as in *Burris* this kind of evidence could have been hard to meld with the evidence that Holman has been normal in prison, has made educational achievements, and so on. *Strickland* holds, however, that the Constitution calls for a professionally competent defense, not for the best possible defense. Our case is not remotely like *Hall*, in which counsel put on no defense and begged the judge to nullify the law; or like *Emerson v. Gramley*, 91 F.3d 898, 906–07 (7th Cir.1996), in which counsel put on no defense and didn't bother to challenge the prosecutor's case; or like *Brewer v. Aiken*, 935 F.2d 850 (7th Cir.1991), in which both medical and lay observers recognized that the defendant was severely impaired, but counsel did not investigate the subject and put on no alternative defense. Holman was not severely impaired—Bjekich testified, without contradiction, that after 17 hours of discussing the case with Holman he did not suspect that Holman had any mental shortcomings—and Bjekich challenged the prosecution's evidence while presenting a well-crafted mitigation defense. Bjekich also testified that he considered the possibility of presenting evidence about Holman's mental abilities but concluded that it would not go over well with the jurors in Will County. The state court credited this testimony, which makes the decision all but immune to constitutional challenge. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Holman's current lawyers give us no reason to suppose that evidence of the kind the record now reveals would have influenced a jury. They offer vigorous *assertion,* but assertion is not a reason. *Stewart* rejects the proposition that *all* evidence of a person's background mitigates guilt, that "[c]ausality is mitigation." 74 F.3d at 136. "Mitigation specialists" believe that a defendant's life history must be presented to the jury, but we have been skeptical, see *Neal*, 99 F.3d at 845–46—and, more to the point, have concluded that neither defense lawyers nor state courts are bound by the Constitution to recite this mantra. How juries react to information is an empirical question. On the one hand, it may show a defendant to be less culpable; on the other, it may show the defendant to be less deterrable. These cut in different directions. Jurors who see capital punishment as the just desert of the wicked will be swayed in favor of lenience; jurors with more instrumental views will incline toward execution as the only way to incapacitate such a person. What little scientific data we possess implies that trying to persuade the jury that the accused is mentally ill is worse than no defense at all. Jurors distrust insanity defenses, believe that the defendants are trying to bamboozle them; if persuaded that the defendants are indeed nutty, jurors believe that death is the only sure way to prevent future crimes. Lawrence White, *Juror Decision Making in the Capital Penalty Trial: An Analysis of Crimes and Defense Strategies,* 11 L. & Human Behavior 113, 122–25 (1987); White, *The Mental Illness Defense in the Capital Penalty Hearing,* 5 Behavioral Sciences & the Law 411 (1987). Accord, Project, *Standardless Sentencing,* 21 Stan. L.Rev. 1297, 1361–63 (1969). Drawing to the jury's attention an organic problem such as mental retardation, though, cuts the other way; jurors are more likely to credit these claims and to express sympathy. Ellsworth, Bukaty, Cowan & Thompson, *The Death–Qualified Jury and the Defense of Insanity,* 8 L. & Human Behavior 45 (1984). Whether such defenses actually help the accused is a close question. The Stanford study finds no effect, 21 Stan.

L.Rev. at 1383, and the Ellsworth study a small one. Holman was not mentally retarded, and his brain injury is neither serious nor related to his criminal conduct. The best estimate, therefore, is that a defense of the kind the district court found Bjekich ineffective for omitting would have been ineffectual—and it could have been counterproductive if it detracted from the other evidence in mitigation. The Supreme Court of Illinois was not "unreasonable" in concluding that neither the "conduct" nor the "prejudice" component of *Strickland* has been made out.

Exhibit B in the district court's catalog of Bjekich's errors was the last question he asked of Antoinette Townsend at the second sentencing hearing: whether she favored capital punishment for her assailant. Antoinette replied: "I think [Holman] should have the death penalty." The district court called asking this question an "egregious error", as if the wisdom of asking a question always depends on the answer. Yet criminal cases are conducted without the panoply of discovery tools available in civil litigation. Lawyers must take calculated risks in deciding what questions to ask. Bjekich believed that a favorable answer—an indication that Antoinette Townsend was willing to extend mercy to Holman—would have been a godsend for the defense, while the answer she actually gave was what the jury would have supposed already. A competent lawyer could have believed that the balance of risks and benefits was favorable, *ex ante*, to the defense. Hindsight (knowledge of Antoinette's answer) does not permit the court to question this decision. A careful lawyer would have minimized the risk by putting the question to Antoinette before the hearing. She did not have to talk to Bjekich, but he was entitled to ask. Oddly, we do not know whether Bjekich sought this information from Antoinette before the sentencing; he was not asked this question in the state evidentiary hearing, and Holman's lawyers did not seek to supplement the record on this point in the district court. We therefore have no basis for believing that Bjekich failed to take prudent steps to minimize the risk.

None of the other shortcomings that Holman now finds in Bjekich's performance draws the adequacy of his legal services into question. The thorough discussion in the 1989 and 1995 opinions of the Supreme Court of Illinois makes elaboration here unnecessary.

## V

Seven issues that the district court included in the certificate of appealability remain to be decided. None is a substantial claim, but because this is a capital case we address each briefly. Holman has combined the seven certified issues into six points, which we take up in order.

■ 1. Holman believes that too few of the grand jurors who returned the indictment were present when the evidence was presented. This claim is not based on the federal Constitution; the grand jury clause of the fifth amendment does not apply to the states. *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). It is instead a claim that the procedure violated state law. Because the Supreme Court of Illinois rejected this contention, 82 Ill.Dec. at 598, 469 N.E.2d at 132, we know that Holman's beliefs about the meaning of Illinois law are mistaken. But even if they were correct, "[a] federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). See also, e.g., *Gilmore v. Taylor*, 508 U.S. 333, 342, 113 S.Ct. 2112, 2117–18, 124 L.Ed.2d 306 (1993); *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 479–80, 116 L.Ed.2d 385 (1991).

2. Jurors who sat in the guilt phase of the trial were screened under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), because in Illinois the same jurors also decide the penalty. Holman believes that jurors so screened are more likely to convict, and that this change in probabilities violated his rights. The Supreme Court rejected this argument in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Holman offers a new wrinkle: that the process of questioning enabled the prosecutor to exercise peremptory challenges in a way that increased the probability that the jurors would support capital

punishment. No such principle has been adopted to date by the Supreme Court, so § 2254(d)(1) precludes its recognition for the first time on collateral review. There is, moreover, a fly in the ointment: the sentence imposed by the jury whose selection Holman protests was vacated by the Supreme Court of Illinois in 1984.

3. According to Holman, three members of the venire for the second penalty trial should have been excused for cause. They were later removed by peremptory challenge, so the district judge ruled that *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), scuttles Holman's argument, because the jury that actually sat was impartial. Holman responds that, had he been able to conserve peremptory challenges, he could have removed other jurors and thus potentially altered the composition of the jury in his favor. This version of the argument was never presented to the state court (or to the district court) and has been forfeited. The argument calls for an extension or modification of existing law, and therefore would fail under § 2254(d)(1) even if it had been preserved. What is more, the foundation of the argument is unsound. The Supreme Court of Illinois concluded that the trial judge did not err in declining to excuse the jurors for cause. 138 Ill.Dec. at 159–62, 547 N.E.2d at 128–31. That decision cannot be called "unreasonable".

4. Once a jury in Illinois finds that a capital crime has been committed and that aggravating circumstances have been established—subjects on which the prosecutor bears the burden of persuasion—it considers the possibility of mitigation without a specific allocation of the burden to either prosecutor or defense. 720 ILCS 5/9–1(g). Holman contends that the lack of a burden in this phase of the proceedings violates no fewer than four amendments to the Constitution. So far, however, no court has been impressed by this argument. To prevail under § 2254(d)(1), the petitioner must show that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States". No "clearly established Federal law, as determined by the Supreme Court of the United States" supports Holman's position. For our part, this court has repeatedly rebuffed constitutional challenges to Illinois' capital-sentencing system. See *Del Vecchio v. Illinois Department of Corrections*, 31 F.3d 1363, 1388–89 (7th Cir.1994) (en banc); *Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990). Section 2254(d)(1) precludes a *volte face* in a collateral attack.

5. Pattern instructions telling an Illinois jury how to weigh aggravating and mitigating circumstances are not ideally clear. Holman contends that the possibility of misunderstanding makes the penalty unconstitutional. This argument has been considered and rejected before, on two independent grounds: first, that it is wrong; second, that even if it were right it seeks to establish a new rule that cannot be used on collateral attack. *Gacy v. Welborn*, 994 F.2d 305, 308–14 (7th Cir.1993); *Free v. Peters*, 12 F.3d 700, 703–06 (7th Cir.1993). These decisions have been ratified by the court en banc. *Del Vecchio*, 31 F.3d at 1389. Holman contends that further empirical work fortifies his submission that the instruction is confusing. Suppose this is so (a subject on which we express no opinion). The second obstacle remains: an argument for the development of more favorable law necessarily fails to establish that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" (§ 2254(d)(1)).

6. Holman contends that during his initial trial he was taking Tranxene, a psychotropic drug, to calm his nerves. He does not argue that this medication made him unable to understand or participate in the proceedings. See *Galowski v. Berge*, 78 F.3d 1176, 1181 (7th Cir.1996). Instead he contends that a judge in Illinois must hold a hearing to determine the effects of medication even if there is no reason to believe that the medicine affects competence to stand trial. This appears to be an incorrect statement of Illinois law, see *People v. Burgess*, 176 Ill.2d 289, 223 Ill.Dec. 624, 680 N.E.2d 357, 363 (1997), though one can say in Holman's favor that the state's highest court has not been entirely consistent

886

in its handling of such claims. Compare *Burgess* with, e.g., *People v. Brandon*, 162 Ill.2d 450, 205 Ill.Dec. 421, 643 N.E.2d 712, 716 (1994). Right or not, however, this is a proposition of *state* law, and therefore not a ground on which a writ of habeas corpus may issue. *Pitsonbarger*, 103 F.3d at 1297–98; Neal, 99 F.3d at 846.

Holman has not established that his conviction or sentence "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States". The judgment of the district court is accordingly reversed, and the case is remanded with instructions to enter an order denying the petition for a writ of habeas corpus.