UNITED STATES of America, ex rel.
James T. FOSTER, Petitioner,

v.

Jerry GILMORE, Respondent.

No. 95 C 5037.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 22, 1999.

Phyllis J. Perko, The Law Offices of Harlovic & Perko, West Dundee, IL, for James T. Foster.

Steven R. Splitt, Attorney Registration & Disciplinary Commission, Chicago, IL, for Jerry Gilmore.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

In 1985, petitioner James T. Foster was convicted and sentenced to death in the Circuit Court of Kane County for the brutal murder of his girlfriend, Jacqueline Simmons. The facts and procedural history of the case are described in detail in the opinion of the Supreme Court of Illinois on petitioner's direct appeal of his conviction, *People v. Foster*, 119 Ill.2d 69, 115 Ill.Dec. 557, 518 N.E.2d 82 (1987). As described in that opinion, petitioner beat Ms. Simmons to death with a baseball bat because he believed she had had sexual relations with another man. Because the evidence established that peti-

tioner had committed aggravated sexual assault against Ms. Simmons during the murder by inserting the splintered bat into her anus, he was eligible for the death penalty under Illinois law.

After exhausting his state postconviction remedies,[1] petitioner filed the instant habeas corpus action pursuant to 28 U.S.C. § 2254, contending that his counsel was ineffective at the guilt-innocence phase of the trial, as well as at the sentencing phase.

On petitioner's motion, this court held an evidentiary hearing to examine his claims, at which the court heard testimony from petitioner's former trial attorneys and the psychiatrist whose testimony and report petitioner claims should have been offered to demonstrate mitigating factors at sentencing. For the reasons set forth below, the court grants in part and denies in part the petition for a writ of habeas corpus.

## I. *Standard of Review*

Because petitioner filed his petition after the enactment of the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("ADEPA"), that statute governs this court's consideration of the petition. *Holman v. Gilmore,* 126 F.3d 876, 881 (7th Cir.1997).[2] This court recently discussed the standard of review in *United States ex rel. Gaines v. Gilmore,* 1998 WL 427612 (N.D.Ill.1998), as follows:

> Any claim adjudicated by a state court on the merits is governed by 28 U.S.C. § 2254(d), under which habeas relief may be awarded only where the state court's adjudication of a petitioner's claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as de-

termined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)—(2). The first phrase of § 2254(d)(1)—authorizing habeas relief when the state court's decision is "contrary to" clearly established federal law as determined by the Supreme Court—pertains only to questions of law. *Lindh v. Murphy,* 96 F.3d 856, 868 (7th Cir.1996) (en banc), *rev'd on other grounds,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The second phrase of § 2254(d)(1)—authorizing habeas relief when the state court's decision "involved an unreasonable application" of clearly established federal law as determined by the Supreme Court—pertains to mixed questions of law and fact. *Id.* at 870. This phrase "tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called 'unreasonable.'" *Id.* A state court's application of Supreme Court precedent is reasonable if it is "at least minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997). "[W]hen the constitutional question is a matter of degree, rather than concrete entitlements, a ... responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support [a state court's] judgment." *Lindh,* 96 F.3d at 871. Thus, "[t]he 'statutory unreasonableness' standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes." *Hall v. Washington,* 106 F.3d 742, 748 (7th Cir.1997). In other words, if a state court asks the "legally

---

1. Petitioner filed a petition under the Illinois Post–Conviction Hearing Act, 725 ILCS 5/122–1, *et seq.,* which asserted constitutional violations including those advanced in the instant habeas proceeding. The trial court dismissed the post-conviction petition without an evidentiary hearing and the Supreme Court of Illinois affirmed. *People v. Foster,* 168 Ill.2d 465, 214 Ill.Dec. 244, 660 N.E.2d 951 (1995). The parties agree that the issue of procedural default is not present in the instant case. *Boerckel v. O'Sullivan,* 135 F.3d 1194 (7th Cir.1998).

2. Petitioner has requested this court to refuse to apply the AEDPA retroactively to this case, relying on the recent Ninth Circuit decision in *Calderon v. United States District Court,* 163 F.3d 530 (9th Cir.1998). Until the Seventh Circuit (or the Supreme Court) overrules *Holman v. Gilmore, supra,* however, this court is bound to follow that decision and apply the AEDPA to this case because the case is not considered to have "commenced" for retroactivity purposes until petitioner filed a motion for appointment of counsel. In the instant case, that date was after the effective date of the AEDPA.

correct question [such as] whether the trial judge abused his discretion ... [then] the 'fact-specific answer cannot be called "unreasonable" even if it is wrong ...'" *Lindh*, 96 F.3d at 867–77.

Applying these standards, the court finds that petitioner has failed to meet his burden with respect to his representation at the trial, but has demonstrated that his counsel was constitutionally ineffective at the sentencing phase.

## II. *Discussion*

### A. *The Trial*

To succeed in his claim that his trial counsel was ineffective, petitioner must demonstrate that his lawyer's conduct "fell below an objective standard of reasonableness" and was "outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As petitioner acknowledges, unless his lawyer's performance was so deficient that the trial "loses its character as a confrontation between adversaries," he must also show prejudice by demonstrating that it is reasonably likely that, but for counsel's errors, the decision reached would have been different. *Id.*, at 696, 104 S.Ct. 2052; *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). And, as mentioned previously, petitioner must demonstrate that the state court's decision on this point "involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

■ Petitioner has failed to meet this burden with respect to his lawyers' conduct at trial. Petitioner bases his claim to ineffective assistance at trial principally on the assertion that his counsel effectively admitted petitioner's guilt when he stated at closing argument that petitioner "killed the woman he loved." Unfortunately for petitioner—not to mention Ms. Simmons—this statement was indisputably true.

This issue was thoroughly addressed by the opinion of the Supreme Court of Illinois denying petitioner's postconviction claims. *People v. Foster*, 168 Ill.2d 465, 487–88, 214 Ill.Dec. 244, 660 N.E.2d 951, 961–62 (1995). As noted by the state court, counsel's closing argument was consistent with the defense theory that petitioner "did not possess the requisite intent or knowing mental state for a murder conviction," and conceded only "one element of murder which was incontrovertible in light of the evidence." *Id.* Having reviewed the evidence and mindful of the Illinois court's proper application of the *Strickland* test, this court cannot conclude that the state court's application of United States Supreme Court precedent in this regard was not "minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper, supra*, 109 F.3d at 335.

■ Petitioner also argues that his trial attorneys were constitutionally ineffective in their failure to present an occurrence witness who had allegedly agreed to testify for petitioner[3] but who, at the last minute (but foreseeably according to petitioner) refused to testify based on his Fifth Amendment privilege against self-incrimination. The Illinois Supreme Court addressed this issue in its postconviction opinion, concluding that, "[i]n light of the facts of the case at bar, there is no reasonable likelihood that testimony that the defendant was intoxicated on the night of the murder would have successfully established the defense of voluntary intoxication or reduced defendant's culpability to provide a basis for a conviction of voluntary manslaughter."[4] *Id.*, 168 Ill.2d at 483–84, 214 Ill.Dec. 244, 660 N.E.2d at 960. The Illinois Supreme Court went on to note that the evidence presented at the trial refuted petitioner's claim of intoxication, despite counsel's vigorous cross examination of prosecution witnesses.

Once again, this court cannot conclude that the state court's decision on this issue "involved an unreasonable application" of clearly established federal law as determined by

---

**3.** According to petitioner, this testimony would have established that petitioner was intoxicated on the night of the murder, and thus incapable of having the requisite intent to commit that crime.

**4.** The trial court had refused to give a voluntary manslaughter instruction, thus requiring the jury to find petitioner either guilty or not guilty of murder.

the United States Supreme Court. In light of the overwhelming evidence presented at trial of petitioner's repeated assaults on Ms. Simmons over an extended period of time, and his demeanor during that time, neither the postconviction state court nor this court in a habeas proceeding would be justified in concluding that petitioner's trial counsel was ineffective at the guilt-innocence phase of the proceedings.

## B.  *Sentencing*

Petitioner's claim to ineffective assistance of counsel at the sentencing phase presents far more difficult issues and requires a thorough review of the events (and nonevents) leading to the imposition of the death penalty by the trial judge.

Petitioner's lead attorney at trial was Frank Giampoli, a part-time Assistant Kane County Public Defender, who was assisted by Frank Chabalewski, the full-time public defender.  Mr. Giampoli did most of the work at the guilt-innocence phase of the trial, while Mr. Chabalewski took a more active role at the sentencing phase.  Both of these attorneys testified at the evidentiary hearing conducted by this court.  This was Giampoli's and Chabalewski's first capital murder case. Both attorneys were burdened with heavy case loads at the time of the trial and sentencing.  Prior to the trial, petitioner's counsel had decided to have the judge, not the jury, decide the penalty phase.  They recognized that they had little or no defense to the murder charge, and had decided early on that they would not present an insanity defense.

Yet, neither lawyer had even bothered to contact a psychiatric expert until *after* the jury returned its verdict on June 7, 1985. At that time, they contacted Dr. Lyle Rossiter, an eminently qualified psychiatrist who performed services for both the prosecution and defense in criminal cases.[5]  On the day defense counsel first contacted Dr. Rossiter, the sentencing hearing was set for June 11, 1985, only four days away.  Although the trial judge granted a short continuance to allow Dr. Rossiter to evaluate petitioner, that evaluation was necessarily abbreviated.

Defense counsels' hope, as expressed repeatedly to the trial judge, was that Dr. Rossiter would be able to establish that petitioner was under the influence of an "extreme mental or emotional disturbance" at the time of the murder, thus meeting one of the factors that must be considered in mitigation in a death penalty case under Illinois law.  Ill.Rev.Stat.1985, ch. 38, ¶ 9–1(c)(2) (the "Illinois Death Penalty Act").

The sentencing hearing was held on June 11, 12, 18 and 25, 1985.  The prosecution offered a large number of witnesses and exhibits demonstrating that petitioner had a long history of violent, bizarre, self-destructive behavior.[6]  The defense called a number of petitioner's friends and relatives, who testified that he had good character, and several witnesses to rebut certain evidence that the prosecution had presented.

On the first day of the sentencing hearing, June 11, 1985, defense counsel requested and received a two week continuance for the express purpose of determining whether to present Dr. Rossiter as a mitigation witness to address the issue of whether petitioner committed the murder under the influence of an extreme mental or emotional disturbance. Dr. Rossiter examined petitioner on June 8 and June 19, 1985.  Although he needed more time to complete a full evaluation of petitioner's mental and emotional condition, he submitted a written report on June 21, 1985.[7]  As discussed more fully below, Dr.

---

5.  Dr. Rossiter testifies for the prosecution, mainly in DuPage County, two-thirds to three-quarters of the time.

6.  As just one example, several Aurora police officers testified about an incident in which petitioner obstructed and threatened paramedics who were attempting to extract a victim from an overturned vehicle after an accident, and then stabbed one of the officers with a concealed knife after petitioner had been placed under arrest and handcuffed.

7.  In the two-page June 21 report, Dr. Rossiter found that petitioner had suffered a series of serious head injuries as a youth and diagnosed him as having a number of mental disorders, including substance abuse, antisocial personality disorder and borderline paranoid schizophrenic disorder.  Dr. Rossiter also noted that he needed more time to complete the testing of petitioner,

Rossiter would have testified that at the time of the murder petitioner had been suffering from an "extreme emotional disturbance." As Dr. Rossiter explained at the evidentiary hearing before this court, petitioner was "in a state of significant disorganization of thought and intense emotion ... his thoughts were disorganized. His emotions were over-reactive. His behavior was destructive and maladaptive and highly irrational."

Recognizing that Dr. Rossiter could offer helpful mitigation testimony, defense counsel nevertheless decided not to call him as a witness at the sentencing hearing because Dr. Rossiter had also concluded that petitioner had an antisocial personality disorder and a "pronounced tendency toward explosive behavior and aggressive physical outbursts." Counsel determined that this conclusion would cause Dr. Rossiter's testimony to "hurt more than help." Consequently, the defense presented no meaningful mitigation evidence at sentencing, a fact noted by the trial judge in imposing the death penalty. Indeed, at sentencing the judge stated:

> In taking into consideration the evidence that's before the Court, both at the evidence taking at the time of the trial and also in the rather extensive hearing in aggravation and mitigation, I cannot find any evidence that indicates or shows me that the murder was committed while defendant was under the influence of extreme mental or emotional disturbance. There just isn't evidence of that factor
>
> \*　\*　\*　\*　\*　\*
>
> The court ... affirmatively finds there is no mitigating factors sufficient to preclude the imposition of the sentence [of death]. [Tr. 6/25/85, pp. 60, 64.]

■ This court finds inexplicable—and wholly ineffective—defense counsels' failure to consult a psychiatric expert prior to or even during the trial. Both attorneys had prior experience with Dr. Rossiter and recognized his obvious expertise. Especially in light of their well-founded conclusion that there was little or no defense to petitioner's guilt, the only hope of saving him from the death penalty lay in establishing his mental state to the judge, in whose hands they had placed the sentencing decision. How they could have laid the groundwork for demonstrating extreme mental or emotional disturbance without having consulted with a psychiatric expert prior to or during the trial is beyond the understanding of this court. Their only attempt at trial to address petitioner's mental state was to elicit evidence of intoxication, evidence that, as previously noted, the Illinois Supreme Court found had been refuted.

■ Having heard the evidence at the trial, and having continued the sentencing hearing to allow Dr. Rossiter to examine petitioner in connection with a mitigation presentation, the trial judge was inevitably under the impression—as he stated on the record—that "there just isn't any evidence" to show that petitioner was under the influence of extreme mental or emotional disturbance at the time of the murder.[8] As Dr. Rossiter testified before this court, however, there was indeed such evidence available to the defense. But that evidence was withheld from the sentencing judge and the Illinois Supreme Court on direct appeal. Moreover, at the post-conviction stage, the trial court refused to hold an evidentiary hearing and thus did not have available to it the mitigation evidence presented to this court.

It is one thing to make reasoned, strategic decisions about which evidence or which witnesses to present to prove or disprove a point. *See People v. Foster*, 168 Ill.2d 465,

including neurological testing, and that he hoped to be prepared to testify at the final sentencing hearing on June 25, 1985.

8. Respondent in the instant habeas action has argued that this court cannot presume or speculate that the trial judge drew a negative inference from defense counsels' failure to present psychiatric evidence after having told the judge they had gathered such evidence and had obtained a continuance for that purpose. Yet, this court notes that at the final sentencing hearing the prosecution invited just such a negative inference (Tr. 6/25/85, p. 12), although the judge declined to draw one, stating, "I think the record does reflect that [defense counsel] did have the opportunity to have the [petitioner] evaluated and tests performed and things of that nature, and that's ... as far as it goes." (*Id.*, p. 13).

491, 214 Ill.Dec. 244, 660 N.E.2d 951, 963 (1995). It is entirely another to decide to present nothing at all, especially at a capital sentencing hearing following a trial in which the only evidence pointed to a brutal, senseless murder. At that point, anything would have helped. Other than some weak, ineffective testimony from petitioner's family and friends, the defense presented no evidence in mitigation. As the trial judge noted, there was no evidence whatever of any of the five factors that the sentencing court must consider under the Illinois Death Penalty Act. It was defense counsel's duty to attempt to fill this vacuum, a duty that could have been fulfilled by presenting Dr. Rossiter.

In the instant case, having heard Dr. Rossiter's testimony at the evidentiary hearing, in which he was subjected to skillful cross-examination, this court concludes that his testimony would have demonstrated the statutory mitigating factor of extreme mental or emotional disturbance.[9] This court finds that Dr. Rossiter was highly credible and that his testimony was effective and persuasive. The failure to present this testimony at the sentencing hearing was inexcusable.

Dr. Rossiter stated to this court that he would have testified that petitioner had experienced disorganization of thought at the time of the murder, that petitioner suffered from several mental conditions, including chronic depression (which was likely aggravated by the death of his mother several months before the murder), and that the initial tests showed the possibility of paranoid schizophrenia. In addition, petitioner's history of head injuries indicated the possibility of brain damage. Dr. Rossiter believed that petitioner was paranoid, suspicious, delusional, and prone to extravagant reaction.

Dr. Rossiter (who, as mentioned earlier, had a great deal of experience testifying in criminal cases for both the defense and the prosecution) defined the term "extreme emotional disturbance" (which he recognized as a legal, not a medical term) as:

... representing an individual who is in great subjective distress or who is perhaps in addition acting out in some way behaviorally his condition of subjective distress. And that would consist of some degree of disorganization of thought, or at least irrationality of thought, either on a neurotic or a psychotic level in some maladaptive sense anyway, and intense emotional expression and feeling beyond what would ordinarily be appropriate in a given situation. [Tr. 7/17/98, pp. 140–41.]

Using that definition, Dr. Rossiter concluded—and was prepared to testify at sentencing—that petitioner's mental disorders caused him to act under an "extreme emotional disturbance" when he murdered Jacqueline Simmons:

Q. So I'm now asking whether with a degree of psychiatric certainty you can state that Mr. Foster had disorganization of thought at the time of the offense in January of 1985?

A. Yes, I think he did.

Regardless of what label you call it, it's possible paranoid schizophrenia or borderline psychosis or any other label, there is a number of indications that his thinking at the time of the offense was characterized by a great deal of what we call projective processes, which are kind of related to paranoid ideation, and the degree of rage, extent of his suspiciousness almost delusional, or perhaps frankly delusional, beliefs that the victim was engaging in some sort of sexual problems or sexual behavior that was—even his reaction to that was so extravagant that one could hardly call that the product of normal thought processes. So there is certainly indications of some kind of disorganization of thought by whatever label one chooses to give it. [Tr. 7/17/98, p. 133.]

\* \* \* \* \* \*

My understanding of this man, this particular defendant, James Foster's mental state at the time of the offense really derives from my own evaluation of him and

---

9. Of course, the prosecution would have had the opportunity to present its own psychiatric evidence at sentencing. This court reaches its conclusion based on Dr. Rossiter's testimony on both

direct and cross examination, during which he convincingly defended his conclusion that petitioner was acting under an extreme emotional disturbance.

psychological test indications that suggest, again, by whatever label, that he was in a state of significant disorganization of thought and intense emotion, in this case rage, undoubtedly a great deal of anxiety as well, which is always part of a picture in which an individual in an intense romantic and sexual relationship is in that much distress. There are always elements of intense anxiety in such situations.

But what was most apparent were the—I referred to before as quasi-delusional and perhaps delusional ideas about the victim's sexual behavior and his clearly irrational response both—well, in all three categories with regard to the way he thought about it, the way he emoted and expressed himself emotionally and the way he behaved motorically.

From all three points of view, this man seemed to be in a state of extreme emotional disturbance. He was certainly not in a normal frame of mind. And his behavior was in a high degree irrational at the time.

So in answer to your question, I would say, yes, that he was in extreme emotional disturbance in those respects. His thought was disorganized. His emotions were overreactive. His behavior was destructive and maladaptive and highly irrational. [Tr. 7/17/98, p. 142.] [10]

Yet, Dr. Rossiter testified that he was "not asked by defense counsel to examine the question of whether [petitioner] was in a state of extreme emotional distress at the time [of the murder]." Coupled with the insufficient time to complete the psychiatric tests on petitioner, counsel's "decision" not to offer Dr. Rossiter as a mitigation witness is unexplainable and nonsensical.[11] For example, petitioner's explosive personality disorder was, far from being overly harmful, consistent with Dr. Rossiter's conclusion that

petitioner was acting under an extreme emotional disturbance.

The sentencing judge did not see Dr. Rossiter's written report or hear his testimony. The state courts that reviewed petitioner's sentence at the post-conviction stage had only the benefit of the two-page written report, and not the benefit of Dr. Rossiter's live testimony. Unlike those courts, this court was able to observe Dr. Rossiter and evaluate the value and persuasiveness of his opinions. The failure to present Dr. Rossiter as a witness in mitigation at the sentencing hearing deprived the sentencing judge of valuable testimony which, as discussed below, would necessarily have altered the judge's findings.

In reaching this conclusion, with all due respect to both the trial judge and the reviewing state courts, this court relies not only on the credibility of Dr. Rossiter and the effectiveness of the evidence he would have presented, but also on the fact that the sentencing judge noted specifically that "there just isn't any evidence" to support the proposition that the murder was committed while petitioner was under the influence of an extreme mental or emotional disturbance. Because the Illinois Death Penalty Act *requires* the sentencing court to consider this factor, it is axiomatic that the presentation of such evidence would have influenced the sentencing judge.

At the post-conviction stage, the trial court refused to hold a hearing, and the Illinois Supreme Court affirmed, holding that based on Dr. Rossiter's report, it was not probable that the trial judge would not have imposed the death penalty had Dr. Rossiter testified. As discussed above, however, neither post-conviction court heard or read Dr. Rossiter's testimony. As this court has found after hearing such testimony, Dr. Rossiter would likely have been able to establish that peti-

---

**10.** On cross-examination, Dr. Rossiter confirmed that in reaching his conclusions he had considered the facts of the crime, including the extended length of the occurrence and petitioner's actions to attempt to exculpate himself.

**11.** Indeed, it does not appear that counsel made a "decision" not to offer Dr. Rossiter, but rather simply succumbed to the fact that they were not prepared to do so. As the Eleventh Circuit has

stated in a similar situation, "this case points up an additional danger of waiting until after a guilty verdict to prepare a case in mitigation of the death penalty: Attorneys risk that both they and their client will mentally throw in the towel and lose the willpower to prepare a convincing case in favor of a life sentence." *Blanco v. Singletary,* 943 F.2d 1477, 1503 (11th Cir.1991).

tioner met the statutory mitigating factor of having committed the act while experiencing an extreme emotional disturbance.[12] This court concludes, therefore, that the inexcusable failure to present Dr. Rossiter's testimony rises to the level of constitutionally ineffective assistance of counsel.

The court finds for these reasons that the conclusion of the state post-conviction courts that the failure to offer Dr. Rossiter as a mitigation witness did not constitute ineffective assistance of counsel, especially in the absence of an evidentiary hearing including the testimony of the defense attorneys and Dr. Rossiter, was an "unreasonable application of federal law, as determined by the Supreme Court of the United States" in *Strickland, supra,* under the *Lindh* standard of review. The court therefore grants petitioner's writ of habeas corpus with respect to sentencing, which writ shall issue unless petitioner is afforded a new sentencing proceeding within 60 days of this order or unless respondent fails to seek a stay of this order and files a timely appeal.

## CONCLUSION

For the reasons set forth above, the court denies the petition for a writ of habeas corpus with respect to the guilt-innocence phase of the trial, but grants the writ with respect to sentencing subject to the conditions discussed above.

12. Of course, this court is not suggesting that on resentencing the trial court will be compelled to impose a sentence other than death. The mere presence of mitigation evidence does not preclude imposition of a death sentence. *People v. Wilson,* 164 Ill.2d 436, 461, 207 Ill.Dec. 417, 647 N.E.2d 910, 922 (1994). This court holds only that in providing effective counsel, the defense should present, and the court is required to consider, the available mitigation testimony of Dr. Rossiter.